UNITED STATES DISTRICT COURT
DISTRICT OF NORTH DAKOTA
EASTERN DIVISION

JEFF HOAG and ANN HOAG, on their own
behalf and on behalf of those similarly
situated,

Civil Action No. 3:15-cv-00075-RRE-ARS

Plaintiffs,

v.

EIDE BAILLY LLP, a North Dakota
professional limited liability partnership,

Defendant.

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT EIDE BAILLY LLP'S RULE 12(b)(6) MOTION
TO DISMISS FOR FAILURE TO STATE A CLAIM**

This lawsuit is just one of three virtually identical purported class action lawsuits that

Plaintiffs' counsel has simultaneously commenced against Defendant Eide Bailly LLP ("Eide").

*See Hoag v. Eide Bailly LLP*, No. 0:15-cv-03182 (D. Minn.); *Martin v. Eide Bailly LLP*, No.

1:15-cv-1202 WTL-DKL (S.D. Ind.).[1]  These lawsuits trail dozens and dozens of previous civil

lawsuits that were brought against various parties following the 2008 downfall of the Idaho-

based real estate syndication business of DBSI Inc., including one previous lawsuit against Eide

that the litigation trustee appointed by the bankruptcy court brought on behalf of thousands of

investors who opted to assign their claims to him as part of DBSI Inc.'s Chapter 11 bankruptcy

---

[1]  The Indiana lawsuit was recently dismissed for lack of personal jurisdiction over Eide.  The
Minnesota lawsuit was and remains stayed pending the outcome of the Indiana lawsuit.

plan. *See Zazzali v. Eide Bailly LLP*, No. 1:12-CV-349-S-MJP (D. Idaho).[2]  That one previous lawsuit against Eide has been settled, as have many other cases that the court-appointed trustee brought against other parties; but a considerable number of civil actions are still pending in Idaho.[3]

This matter arises out of what Plaintiffs' Complaint ("Complaint") [Dkt. 1] refers to as a "Ponzi scheme" perpetrated by DBSI, Inc. (f/k/a DBSI Housing Inc.) ("DBSI Housing") and numerous affiliates (referred to collectively, with DBSI Housing, as "DBSI").  Compl. [Dkt. 1] ¶¶ 1-5.  Operating out of Boise, Idaho, DBSI marketed and sold a variety of real estate-related investment vehicles over the course of many years, while representing itself to be financially sound and its various offerings to be highly successful.  *Id*. ¶¶ 2-3.  The picture changed in late 2008, however.  DBSI filed bankruptcy in November of 2008.  *Id*. ¶ 12; *see also In re DBSI, Inc.*, No. 08-12687 (PJW) (Bankr. D. Del.) ("DBSI Bankr. Case" or the "Bankruptcy Case").  Moreover, several investor lawsuits alleging fraud or conversion by DBSI (including an Idaho class action) were filed in Idaho state court just before the Bankruptcy Case was filed, and the State of Idaho Department of Finance subsequently brought its own fraud-based lawsuit against DBSI founder Douglas Swenson and various DBSI entities in January of 2009.  Declaration of Curtis D. Smith ("Smith Decl."), Exs. 6-8 and Ex. 11.

The U.S. Bankruptcy Court for the District of Delaware entered an Order of Confirmation, dated October 26, 2010, that confirmed the Second Amended Joint Chapter 11 Plan of Liquidation of DBSI Inc. (the "Plan").  DBSI Bankr. Case, [Dkt. 5924 and 5699].  In

---

[2] All investors who invested in any DBSI product, including Plaintiffs, were given notice of the opportunity to assign their claims to the court-appointed trustee.  Plaintiffs chose not to assign their claims to the trustee, but instead waited years to proceed on their own against Eide.

[3] Lists of open and closed DBSI-related civil actions in the District of Idaho are attached as Exhibit 1 to the Declaration of Curtis D. Smith ("Smith Decl.") submitted in support of Eide's various Rule 12 motions.

addition to consolidating the estates of the various DBSI debtors, the Plan created two trusts – the DBSI Estate Litigation Trust (the "ELT") and the DBSI Private Actions Trust (the "PAT") – to pursue litigation against various DBSI insiders, broker-dealers and outside professionals on behalf of the debtor and thousands of investors who elected to assign their personal damage claims to the PAT. *Id.* [Dkt. 5699]. Thereafter, the trustee for the two trusts filed a series of lawsuits against numerous defendants (including Eide). *See*, *e.g.*, *Zazzali v. Swenson,* No. 1: 10-cv-950 (D. Del.), *venue transfer to Idaho*, No. 1:13-cv-86 (D. Idaho); *Zazzali v. Moffatt Thomas Barrett Rock & Fields CHTD,* No. 1:10-cv-967 (D. Del.); *Zazzali v. Hirschler Fleischer P.C.*, No. 1:11-cv-614 (D. Del.); *Zazzali v. Foley & Lardner LLP*, No. 1:11-cv-1058 (D. Del.); *Zazzali v. Eide Bailly LLP*, No. 1:11-cv-00691 (D. Del.), *venue transfer to Idaho*, No. 1:12-cv-349-S-MJP (D. Idaho)*; Zazzali v. Berthel Fisher & Co. Fin. Servs. Inc.*, No. 1:11-cv-625 (D. Del.), *venue transfer to Idaho*, No. 1:14-cv-418 (D. Idaho); *see also* Smith Decl. Ex. 1 (PACER lists of District of Idaho lawsuits) and Ex. 2 (PACER list of District of Delaware lawsuits).

Plaintiffs commenced this action on July 31, 2015, a date well over six years after each of the following dates: (a) the date DBSI filed for bankruptcy protection; (b) the commencement dates of the above-described lawsuits brought by other investors and the State of Idaho; and (c) the dates on which numerous investors (including at least a dozen members of the putative class that Plaintiffs seek to represent) accused DBSI and the DBSI Insiders of fraud in letters sent to the bankruptcy judge. Plaintiffs' Complaint, which is very closely modeled after the amended Complaint that the trustee for the ELT and the PAT filed in his lawsuit against Eide (*Zazzali v. Eide*, No. 1:12-cv-349-S-MJP (D. Idaho), Dkt. 127), purports to assert fraud-based claims against Eide on behalf of Plaintiffs and thousands of unidentified investors who chose not to assign their personal damage claims to the PAT. Eide moves the Court, pursuant to Fed. R. Civ. P. 12(b)(6), to dismiss the Complaint because all of Plaintiffs' claims are time-barred and

3

because the Complaint otherwise fails to state a claim on which relief may be granted for the reasons mentioned above and more fully set forth below.

<b>STATEMENT OF RELEVANT FACTS</b>[4]

From its home office and center of operations in Boise, Idaho, DBSI marketed and sold a variety of real estate-related investment vehicles.  Compl. [Dkt. 1] ¶¶ 3, 52-133.   The main products of DBSI's investment business were hundreds of property-specific investments known as tenant-in-common (or "TIC") interests.  *Id.* ¶¶ 52-89.   The TIC interests offered tax and investment benefits, including income from rental payments and the right to share in property appreciation.  *Id.* ¶¶ 48-51, 73, and 81-87. The TIC investments were structured so that investors purchased undivided fractional interests in real property that was leased to a DBSI affiliate under a master lease.  *Id.*  The master lessee would sublet the property to a master tenant and bear the expenses associated with improvements, and DBSI would guarantee the investors a stream of income from the rents.  *Id.* ¶¶ 86-88.

The TIC interests were sold either as deeded interests in land through traditional real estate brokers who worked with a DBSI entity named FOR 1031 LLC (later known as Spectrus Group LLC), or as investment securities through securities brokers and a DBSI entity named DBSI Securities Corporation ("DBSI Securities").  *Id.* ¶¶ 52-89.

To help finance its TIC syndication operations and other business interests, DBSI sold investment notes through a series of DBSI entities, including DBSI 2005 Secured Notes

---

[4] The allegations contained in the complaint are taken as true when a defendant makes a motion under Rule 12(b)(6).  *Bell v. Pfizer, Inc.*, 716 F.3d 1087, 1091 (8th Cir. 2013).  In addition to the allegations of the Complaint, Eide relies upon documents filed in other DBSI-related legal actions that are a matter of public record and upon documents to which the Complaint refers. When deciding a Rule 12(b)(6) motion, a court may properly take judicial notice of such documents without converting the motion to one for summary judgment.  *See Miller v. Redwood Toxicology Lab., Inc.,* 688 F.3d 928, 931 (8th Cir. 2012); *Greenman v. Jessen,* 787 F.3d 882, 887 (8th Cir. 2015).

Corporation ("2005 Notes Corp."), DBSI 2006 Secured Notes Corporation ("2006 Notes Corp."), and DBSI 2008 Notes Corporation ("2008 Notes Corp."). *Id*. ¶¶ 115-131; *see also* Smith Decl. Ex. 3 (2006 Notes Corp. PPM), Ex. 4 (2005 Notes Corp. PPM) and Ex. 5 (2008 Notes Corp. PPM).[5]

Plaintiffs Jeff and Ann Hoag invested $50,000 investment in 2008 Notes Corp. ("2008 Notes") and $100,000 in Land Improvement & Development Fund LLC ("LID"). Compl. [Dkt. 1] ¶ 34. The Complaint does not indicate how Plaintiffs decided to make those investments, whom they communicated with before investing, what Plaintiffs were told, what written materials Plaintiffs reviewed (if any), and how Plaintiffs relied on Eide (if at all).

Eide audited a comparatively small number of the hundreds and hundreds of DBSI-companies that eventually existed. Compl. Ex. E [Dkt. 1-5].[6] Significantly, it is undisputed that Eide never audited DBSI Housing, which acted as the ultimate guarantor of the obligations of many of the DBSI companies. *Id*. It is also undisputed that Eide never audited 2008 Notes Corp. or LID, the two entities in which Plaintiffs invested.

While certain individual TIC investment properties were profitable, the overall TIC portfolio was not. Compl. ¶ 95. The situation got worse for the TIC syndication business in 2007, when the U.S. Securities and Exchange Commission ordered a halt to the sale of TICs

---

[5] Unlike the Private Placement Memoranda ("PPMs") related to the 2005 Notes Corp. and 2006 Notes Corp. offerings, the 2008 Notes Corp. PPM does not state that the funds raised "will be used only to acquire, develop and finance real estate properties prior to their sale." *Compare* Smith Decl. Ex. 5 *with* Smith Decl. Exs. 3-4. To the contrary, the 2008 Notes Corp. PPM expressly states that the funds raised will also be used "to finance or refinance non-real estate Entities." Smith Decl. Ex. 5 at 1, 6, 10, 12, 16, 20 and 24. Moreover, the 2008 Notes Corp. PPM expressly identifies a number of technology companies to which it was anticipated that 2008 Notes Corp. would be making loans. *Id*. at 24-26.

[6] Comparing Exhibit E of the Complaint to Exhibits F and G reveals that Eide audited only six of the more than 160 entities listed in Exhibits F and G. Furthermore, Exhibits F and G include only about a quarter of the more than 600 DBSI companies that eventually existed. Thus, it is beyond dispute that Eide audited only a small percentage of the DBSI companies.

through real estate brokers after finding that doing so amounted to the sale of unregistered securities. *Id*. ¶ 54. At that point, DBSI was hemorrhaging losses at an estimated burn rate of $3 million per month. *Id*. ¶ 145.

In an effort to stave off looming catastrophe, DBSI floated the 2008 Notes Corp. offering in February of 2008, using a PPM that was allegedly laced with misrepresentations and material omissions concerning the financial condition of DBSI. Smith Decl. Ex. 5. The PPM also revealed another financial burden for DBSI that was not disclosed in prior Notes Corp. offerings – DBSI had been investing millions of dollars in a number of technology start-up companies and was proposing to use a significant portion of the proceeds from the 2008 Notes Corp. offering to continue to fund those non-real estate investments. *Id*. at 24-26. There is no allegation that Eide had anything to do with the offering statements for 2008 Notes Corp. or LID, or the technology start-up companies.

The money raised by the 2008 Notes offering did not solve DBSI's financial woes and, when DBSI stopped making monthly payments to TIC investors, investors began commencing lawsuits. Smith Decl. Exs. 6-8. Between October 27, 2008 and November 7, 2008, eleven separate investor lawsuits were commenced in Idaho state court, including one putative class action. *Id*.

DBSI and nearly 150 other related entities filed for Chapter 11 bankruptcy protection on or about November 10, 2008, in the U.S. Bankruptcy Court for the District of Delaware. Smith Decl. Ex. 9; Compl. [Dkt. 1] ¶¶ 12 and 16. Within days, notice was provided to all potential creditors of the bankrupt entities, including Plaintiffs and thousands of other investors. *See* DBSI Bankr. Case [Dkt. 10 and 96].

Over the ensuing weeks and months, a large number of individual investors wrote letters to the bankruptcy court to complain that DBSI was a "Ponzi scheme" and that the DBSI Insiders

were stealing from investors.  Smith Decl. Ex. 10.  Significantly, at least a dozen of those letter-writing investors appear to fall squarely within the class of investors that Plaintiffs seek to represent (i.e., investors who did not assign their claims to the PAT).

In January of 2009, the State of Idaho Department of Finance brought its own lawsuit against DBSI founder Douglas Swenson and various DBSI entities alleging that the defendants engaged in a scheme to defraud thousands of investors. Smith Decl. Ex. 11.

In March of 2009, a group of TIC investors commenced a securities fraud action against one of the TIC entities and Doug Swenson in the District of Colorado. Smith Decl. Ex. 12.

The Bankruptcy Court eventually confirmed a final plan of liquidation that, among other things, created two trusts – the ELT and the PAT – to pursue claims against third parties and authorized the bankruptcy trustee to act as the trustee for each of those trusts.  DBSI Bankr. Case [Dkt. 5699 and 5700].  The ELT was assigned all of the claims that belonged to the DBSI bankruptcy estate.  *Id.*  The PAT was authorized to solicit and take assignments of claims that belonged to individual investors for the purpose of prosecuting claims on behalf of (and for the benefit of) the assigning investors.  *Id.* Notices were sent to all DBSI investors inviting assignments of the investors' claims.  DBSI Bankr. Case [Dkt. 5737].  Investors who did not assign their claims to the PAT by the initial deadline (including Plaintiffs and at least a dozen of the investors whose letters accusing DBSI of fraud are included in Smith Declaration Ex. 10) received a second notice that contained a later deadline.  DBSI Bankr. Case [Dkt. 7039].  The final deadline for assignments to the PAT was April 15, 2011. *Id.*; *see also* Compl. [Dkt. 1] ¶ 23.

Approximately 4,000 investors assigned their claims to the PAT.  Compl. [Dkt. 1] ¶ 291; *see also Zazzali v. Eide*, No. 1:12-CV-349-S-MJP, Am. Compl. Ex. G [Dkt. 127-7] (D. Idaho) (listing PAT members).  Plaintiffs did not.  *Id*. ¶ 24.[7]

On August 8, 2011, the trustee for the ELT and the PAT filed suit (on behalf of both trusts) against Eide in the U.S. District Court for the District of Delaware (Case No. 1:11-cv-691).  That case was subsequently transferred to the U.S. District Court for the District of Idaho, where it was eventually resolved after nearly four years of litigation.  *See* Compl. [Dkt. 1] ¶¶ 17-31; *see also Zazzali v. Eide*, No. 1:12-CV-349-S-MJP (D. Idaho).

In 2014, while the civil lawsuit against Eide was still being litigated, the ex-COO of DBSI, Gary Bringhurst, entered into a plea agreement with federal prosecutors, and a federal jury subsequently convicted DBSI's top management echelon of committing multiple counts of investor fraud following a seven-week trial.  Compl. [Dkt. 1] ¶ 13.  The specific entities as to which the lead defendant, Doug Swenson, was convicted of securities fraud are listed below, together with the dates of the corresponding offering statements:

| | |
|---|---|
| DBSI 2008 Notes Corporation | 2/6/2008 |
| DBSI North Stafford | 3/14/2008 |
| DBSI Oakwood Plaza | 3/18/2008 |
| DBSI Shoppes at Trammel | 4/1/2008 |
| DBSI Florissant Market Place | 7/2/2008 |
| DBSI Pinehurst Square East | 4/17/2008 |
| DBSI Pinehurst Square West | 4/25/2008 |
| DBSI Peachtree Corners Pavilion | 5/6/2008 |

---

[7] None of the following investors who wrote letters to the Bankruptcy Court in late 2008 and early 2009 accusing DBSI of being a "Ponzi" scheme or other fraud joined the PAT either, meaning they are all members of the putative class that Plaintiffs seek to represent and that Plaintiffs wrongly argue could not have suspected that the DBSI enterprise was a Ponzi scheme before August 3, 2009: William G. Floyd, Andy Virostek, Peter and Louise Zizileuskas, Sridhar Dasari, Brian and Sandra Williams, Harvey Friedlander (letter written by brother in law/joint investor Samuel Minas), Neil Wilburn, Gordon Piller, Donna Fullmer, Lynda Barton, Estate of Elsie Cook (letter written by son in law Rick Wagner), and Daryl and Susan McFarland. *Compare* DBSI Bankr. Case [Dkt. 7039] and *Zazzali v. Eide*, No. 1:12-CV-349-S-MJP (D. Idaho), Am. Compl. Ex. G [Dkt. 127-7].

| | |
|---|---|
| DBSI Portofino Technology Center | 7/16/2008 |
| DBSI Belton Town Center | 8/12/2008 |
| DBSI Boise Foothills | 2/28/2008 |
| DBSI West Boise | 4/14/2008 |
| DBSI Trekell & I-8 | 5/22/2008 |
| DBSI North Jarrell I-35 | 6/3/2008 |
| DBSI E-470 East | 7/28/2008 |

*U.S. v. Swenson*, No. 13-cr-91 (D. Idaho), [Dkt. 21 *et seq.* (Superseding Indictment) and Dkt. 502 *et seq.* (Special Verdict)]. Eide did not audit any of those entities. Compl. Ex. E [Dkt. 1-5]. Nor was Eide's name mentioned in any of the PPMs issued with regard to those entities. Compl. Ex. F [Dkt. 1-6].

## ARGUMENT

**I.    GOVERNING LEGAL STANDARDS.**

### A.    Rule 12(b)(6) Standard.

Though a court faced with a Rule 12(b)(6) motion to dismiss must construe all of the complaint's factual allegations in a light most favorable to the non-moving party, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" will not do. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007)). To survive a motion to dismiss, a complaint cannot simply leave "open the possibility that a plaintiff might later establish some 'set of [undisclosed] facts' to support recovery." *Twombly*, 550 U.S. at 561-62 (citation omitted). Instead, the "Complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (citation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Where a Complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (citation omitted).

9

In addressing a motion to dismiss, "[t]he court may consider the pleadings themselves, materials embraced by the pleadings, exhibits attached to the pleadings, and matters of public record." *Mills v. City of Grand Forks*, 614 F.3d 495, 498 (8th Cir. 2010) (citing *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999) (noting that the same standard applies to a Rule 12(b)(6) motion to dismiss); *Illig v. Union Elec. Co.*, 652 F.3d 971, 976 (8th Cir. 2011).

### B.      Statute of Limitations Standard.

"The purpose of a statute of limitation is to prevent 'plaintiffs from sleeping on their legal rights to the detriment of the defendants.'" *Erickson v. Scotsman, Inc.*, 456 N.W.2d 535, 537 (N.D.1990) (quoting *Hanson v. Williams County*, 389 N.W.2d 319, 321 (N.D. 1986)). "Thus, statutes of limitation are designed to prevent the plaintiff's enforcement of stale claims when, through the lapse of time, evidence regarding the claim has become difficult to procure or even lost entirely." *Id*.

A court may dismiss a claim under Rule 12(b)(6) as barred by the statute of limitations if the complaint itself establishes that the claim is time-barred. *Jessie v. Potter*, 516 F.3d 709, 713 n. 2 (8th Cir. 2008); *Joyce v. Armstrong Teasdale, LLP*, 635 F.3d 364, 367 (8th Cir. 2011) (quoting *Jessie*, 516 F.3d at 713 n. 2) ("[a]s a general rule, 'the possible existence of a statute of limitations defense is not ordinarily a ground for Rule 12(b)(6) dismissal unless the complaint itself establishes the defense.'").

### C.      Rule 9(b) Standard.

A complaint that contains "averments of fraud" must do more than satisfy the *Iqbal*/*Twombly* pleading standard; it must also comply with Fed. R. Civ. P. 9(b)'s particularity requirement which demands a higher degree of notice than that required for other claims, and must identify who, what, where, when, and how. *U.S. ex rel. Costner v. U.S.*, 317 F.3d 883 (8th Cir. 2003), *rehearing and rehearing en banc denied, certiorari denied* 124 S.Ct. 225, 540 U.S.

10

875, 157 L.Ed.2d 137; *Hebron Pub. Sch. Dist. No. 13 of Morton Cty., State of N.D. v. U.S. Gypsum*, 690 F. Supp. 866, 871 (D.N.D. 1988) (Rule 9(b) requires "specification of the time, place, and content of an alleged false representation, but not the circumstances or evidence from which fraudulent intent could be inferred."). "[Federal] Rule [of Civil Procedure] 9(b)'s particularity requirement for fraud applies equally to a claim for aiding and abetting." *E–Shops Corp. v. U.S. Bank N.A.*, 678 F.3d 659, 663 (8th Cir. 2012).

## II.   BASED ON THE FACE OF THE COMPLAINT, PLAINTIFFS' CLAIMS ARE TIME-BARRED.

Plaintiffs' Complaint asserts two causes of action against Eide – Aiding and Abetting fraud (Count One) and Civil Conspiracy to Commit Fraud And/Or Aid and Abet Fraud (Count Two). The gravamen of both counts is Eide's alleged knowledge of, and active participation in, the fraud allegedly committed by the DBSI Insiders.

The North Dakota Supreme Court has not recognized aiding and abetting as a cause of action. *Schneider v. Schaaf*, 1999 ND 235, ¶¶ 20-24, 603 N.W.2d 869, 875-76. In instances where there are more than one tortfeasor, North Dakota recognizes the concept of concerted action. Pursuant to N.D.C.C. § 32–03.2–02, the liability of each of several tortfeasors is separate and several, instead of joint, unless the tortfeasors act in concert to cause injury ("concerted action"). *Target Stores v. Automated Maintenance*, 492 N.W.2d 899, 902 (N.D. 1992). Importantly however, N.D.C.C. § 32–03.2–02 does not create an independent basis for tort liability; it deals only with the allocation of damages among those already at fault. *Hurt v. Freeland*, 1999 ND 12, ¶ 21, 589 N.W.2d 551. To constitute "concerted action" under the Code, Plaintiffs must allege a common plan to commit a tortious act where the participants knew of the plan and its purpose and took substantial affirmative steps to encourage the achievement of the result. *See Hurt*, 1999 N.D. 12, ¶ 23, 589 N.W.2d 551; Restatement (Second) of Torts § 876.

11

Under North Dakota law, a civil conspiracy is a combination of two or more persons who agree to act together to inflict a wrong or an injury upon another, or who agree to act together to commit a lawful act using unlawful means to inflict a wrong or injury upon another.  In order for a civil conspiracy to exist, one of the parties to the alleged conspiracy must commit an act in pursuit of the agreement and the conspiracy must be a proximate cause of damage. *Estate of Wenzel-Mosset by Gaukler v. Nickels*, 1998 ND 16, ¶ 36, 575 N.W.2d 425 (N.D. 1998) (citation omitted); *Hurt*, at ¶ 37, 589 N.W.2d 551, 560 (citation omitted). "The distinguishing factor between a criminal conspiracy and a civil conspiracy is that damages, not the agreement, are the essence of the conspiracy." *Hurt*, at ¶ 37; *Nickels*, at ¶ 37 (citing *Nautical Landings Marina v. First National Bank*, 791 S.W.2d 293, 299 (Tex. Ct. App. 1990)).

Under N.D.C.C. § 28-01-16(6), a claim for fraud must be commenced within six years after the claim has accrued, and the claim does not accrue until discovery of the facts constituting the fraud. *See Podrygula v. Bray*, 2014 ND 226, ¶ 13, 856 N.W.2d 791; *Rose v. United Equitable Ins. Co.*, 2001 ND 154, ¶ 9, 632 N.W.2d 429.  The statute of limitations generally begins to run from the commission of the wrongful act giving rise to the cause of action; however, that rule is subject to a discovery rule. *Podrygula*, at ¶ 14; *Wells v. First Am. Bank West*, 1999 ND 170, ¶ 9, 598 N.W.2d 834. In *Wells*, at ¶ 10 (citations omitted), the North Dakota Supreme Court emphasized that the application of the discovery rule is based on an objective standard, stating as follows:

> The discovery rule postpones a claim's accrual until the plaintiff knew, or with the exercise of reasonable diligence should have known, of the wrongful act and its resulting injury.... We have used an objective standard for the knowledge requirement under the discovery rule. The focus is upon whether the plaintiff is aware of facts that would place a reasonable person on notice a potential claim exists, without regard to the plaintiff's subjective beliefs.

Under N.D.C.C. § 28-01-16, the discovery rule means that notice of facts putting a person of ordinary intelligence on inquiry is equivalent to knowledge of all the facts a reasonably diligent inquiry would disclose. *Podrygula*, 2014 N.D. 226, ¶ 15, 856 N.W.2d 791.  This is consistent with the view that, after acquiring knowledge of facts sufficient to put a person of ordinary intelligence on inquiry, has the responsibility to promptly find out what legal rights result from those facts, and the failure to do so will be construed against that party. *Podrygula*, at ¶ 15.  The discovery rule only requires the plaintiff be aware of an injury; it does not require knowledge of the full extent of the injury. *Dunford v. Tryhus*, 2009 N.D. 212, ¶ 10, 776 N.W.2d 539; *Podrygula* at ¶ 15, 856 N.W.2d 791, 796.

Although North Dakota does not have a specific statute of limitations for concerted action (aiding and abetting) or civil conspiracy, the nature of these claims dictate that the limitations period for those causes of action should be the same as for fraud.  Aiding and abetting fraud and conspiracy to commit fraud are "secondary liability" theories that depend on proof of a viable underlying fraud claim. Under North Dakota law, the underlying act itself must be actionable as a tort to support a claim for civil conspiracy. *See Peterson v. North Dakota University System*, 2004 N.D. 82, ¶ 27, 678 N.W.2d 163 (underlying act was not a tort and could not support a claim for civil conspiracy); *In re North Dakota Personal Injury Asbestos Litigation No. 1*, 737 F.Supp. 1087, 1095 (D.N.D. 1990) (civil conspiracy requires one party to commit an act in pursuance of the agreement that is itself a tort).  Dismissal of the underlying tort claim defeats the related claim for civil conspiracy. *Burris Carpet Plus, Inc. v. Burris*, 2010 N.D. 118, ¶ 45, 785 N.W.2d 164, 179; *Peterson*, at ¶ 27. *Accord, Roney v. Gencorp*, 431 F. Supp. 2d 622, 638 (S.D. W.Va. 2006) ("Like a conspiracy claim, the ability to recover for aiding and abetting necessarily depends upon the ability of a plaintiff to prove the underlying tort.").

Thus, if the primary claim is time barred, so too is the aiding and abetting claim. The statute of limitations cannot properly be any longer for Plaintiffs' aiding and abetting and conspiracy claims than it is for Plaintiffs' underlying, but unplead, tort claim (i.e. fraud). S*ee Anderson v. Pine South Capital, LLC*, 177 F. Supp. 2d 591, 604 (W.D. Ky. 2001) ("[W]e hold that the statute of limitations for a charge of aiding and abetting should fall under the section reserved for the underlying cause of action."); *Bova v. U.S. Bank*, N.A., 446 F. Supp. 2d 926, 934 n.4 (S.D. Ill. 2006) ("[I]t would be illogical to hold that the limitations period for aiding and abetting a violation of the ICFA is longer than the limitations period for direct violations of the statute.").

Plaintiffs allege in the Complaint that Eide aided and abetted, or actively conspired in, what Plaintiffs assert was a "Ponzi scheme" perpetrated by the DBSI Insiders through the various DBSI companies. Plaintiffs have, however, pled themselves out of court by alleging facts sufficient to establish that their underlying fraud claims are barred by the statute of limitations. As set forth in the Complaint, Plaintiffs' theory of liability against Eide is that Eide intentionally participated in and substantially aided and assisted a fraud that involved "creat[ing] the false impression that DBSI Inc. and other DBSI Companies were well-capitalized and able to meet their financial obligations" and using that "illusion of financial health" to "draw Investors into the [DBSI] Insiders' various investment offerings." Compl. [Dkt. 1] ¶¶ 5-6, 44, 190. The falsity of those representations of financial health was revealed to the world no later than when DBSI Housing and various DBSI Companies (including the companies in which Plaintiffs invested) filed for bankruptcy protection on November 10, 2008. *Id.* ¶ 12. Moreover, the fact that Plaintiffs had sustained actionable damages at that point was obvious, because the bankruptcy filing meant that the bankrupt entities could not pay their debts (including amounts owed to

14

Plaintiffs).   Because this lawsuit was not commenced until well over six years later, it is indisputably untimely.

The face of the Complaint conclusively demonstrates that Plaintiffs knew or should have known of the alleged fraud by DBSI and their resulting injury by the time DBSI filed bankruptcy:

- "At the end of 2008, the world learned that DBSI was a Ponzi scheme."  Compl. [Dkt. 1] ¶ 4.

- "Tens of thousands of Investors learned that they had lost their investments [when DBSI filed bankruptcy in November of 2008]."  *Id*. ¶ 12.

- "The Bankruptcy Court docket was crowded with letters from individual Investors telling of lost savings."  *Id*. ¶ 12.

Additionally, these admissions are supported by public records of which this Court may take judicial notice, including each of the following:

- Eleven separate investor lawsuits (including a class action) were filed in the days just prior to DBSI's November 10, 2008 bankruptcy filing. Smith Decl. Exs. 6-8.

- Numerous disgruntled investors (including many members of the putative class that Plaintiffs seek to represent) sent letters to the bankruptcy judge describing DBSI as a fraud during the months following the bankruptcy filing.  *Id.* Ex. 10.

- The Idaho Department of Finance sued various DBSI Insiders in January 2009, alleging securities fraud, and brought a motion asking the Bankruptcy Court to appoint an examiner to investigate specific allegations of fraud.  *Id.* Exs. 11 and 15.

- Several TIC investors commenced a Colorado lawsuit against a DBSI TIC entity, along with Doug Swenson and his sons, in March 2009, alleging numerous claims, including securities fraud, common law fraud and conversion.  *Id.* Ex. 12.

The foregoing conclusively demonstrates that Plaintiffs' purported causes of action accrued no later than the date in November of 2008 when Plaintiffs received notice that the DBSI entities in which they invested had filed bankruptcy.  By then, DBSI had stopped meeting its payment obligations to investors, and a number of lawsuits had already been filed in Idaho

15

against DBSI and DBSI personnel.  As of the time of those events, Plaintiffs plainly had notice "of the wrongful act and its resulting injury" in the form of the unpaid amounts that they were owed under the terms of their investments in 2008 Notes Corp. or LID.  In short, by mid-November of 2008, Plaintiffs were aware of facts that would place a reasonable person on notice a potential claim exists, without regard to the Plaintiffs' subjective beliefs.  Because Plaintiffs failed to commence this lawsuit until well over six years later, this lawsuit should be dismissed.

Thus, any cause of action that Plaintiffs allegedly had against Eide accrued when Plaintiffs were placed on inquiry notice of the underlying fraud that the DBSI Insiders allegedly perpetrated on investors (i.e., when the true financial condition of DBSI Housing and the DBSI Companies was revealed at the time of the bankruptcy petition).  Plaintiffs did not have to know Eide's alleged role in the fraud in order for the statute of limitations to begin running.

For all of these reasons, the Court should conclude that Plaintiffs' purported claims against Eide are time-barred and should dismiss the Complaint with prejudice on that basis.

## III.   PLAINTIFFS' CLAIMS FAIL TO COMPLY WITH RULE 9(b).

Fed. R. Civ. P. 9(b) requires a pleading that contains "averments of fraud" to "state with particularity the circumstances constituting the fraud." Rule 9(b) requires "specification of the time, place, and content of an alleged false representation."  *Hebron Pub. Sch. Dist. No. 13 of Morton Cty., State of N.D. v. U.S. Gypsum*, 690 F. Supp. 866, 871 (D.N.D. 1988).  The Complaint falls woefully short of that mark and should be dismissed, accordingly.

Plaintiffs have failed to allege "the who, what, when, where, and how" with regard to any of their various fraud-based liability theories against Eide.  The Complaint consists almost entirely of very general statements.  For example, Plaintiffs allege that the DBSI Insiders "used … audited financial statements and audit reports to perpetrate and perpetuate their fraud" (Compl. [Dkt. 1] ¶ 11), and that "Investors relied on the Eide Bailly financial statements and

16

audits in deciding whether to initiate or maintain their investments…" *Id*. at ¶ 168.  However, Plaintiffs fail to identify a single audited financial statement or audit report that was transmitted by anyone to any investor, at any time, by any means.

Plaintiffs even fail to articulate the particulars of their own individual fraud-based claims. The Complaint does not contain any allegations whatsoever regarding how Plaintiffs decided to make their respective investments, who communicated with Plaintiffs prior to those investments, what Plaintiffs were told prior to investing, what written materials (if any) Plaintiffs reviewed, and how Plaintiffs relied on Eide (if at all) in deciding whether to initiate or maintain their investments.  Conspicuous by its absence is any allegation that Plaintiffs ever so much as even saw an audit report issued by Eide or a set of financial statements audited by Eide.  Of course, it is not possible that the Plaintiffs could have seen an audit report concerning 2008 Notes Corp. or LID prior to making their investment, since Eide never audited either of these entities. *See* Compl. Ex. E [Dkt. 1-5].

To comply with Rule 9(b), Plaintiffs must plead with particularity each essential element of their fraud claim, including how they relied on the alleged misrepresentations and how that reliance caused them injury. *Quintero Cmty. Ass'n Inc. v. F.D.I.C*., 792 F.3d 1002, 1011 (8th Cir. 2015); *In re NationsMart Corp. Sec. Litig*., 130 F.3d 309, 321 (8th Cir. 1997).  Plaintiffs' Complaint is devoid of the "who, what, where and when" of the alleged fraud and Eide's alleged participation therein, or their reliance on financial statements prepared by Eide.  Accordingly, Plaintiffs' Complaint should be dismissed for failure to comply with Rule 9(b).

17

**IV.**   **CLASS ACTION ALLEGATIONS IN THE COMPLAINT REGARDING DBSI COMPANIES, OTHER THAN 2008 NOTES CORP. AND LID,  SHOULD BE DISMISSED BECAUSE PLAINTIFFS LACK STANDING AND FOR FAILURE TO MEET THE REQUIREMENTS OF RULE 23.**

If the Court does not dismiss the entire action on statute of limitations or Rule 9(b) grounds, Eide also seeks, under Fed. R. Civ. P. 12(b)(6), to dismiss certain of the class action allegations of the Complaint.  The Eighth Circuit has determined that class claims that fail to meet the requirements of Rule 23 may be properly dismissed under Rule 12(b)(6). *McCrary v. Stifel, Nicolaus & Co., Inc.*, 687 F.3d 1052, 1058 (8th Cir. 2102) ("class claims that fail to meet the requirements of Rule 23 may be properly dismissed by granting a Rule 12(b)(6) motion."). The class action allegations in the Complaint fail to identify a proper putative class and, together with the other allegations in the Complaint, fail to establish even a *prima facie* basis that Plaintiffs are qualified to represent the purported class.  One of the paramount problems in that regard is the wide disparity in the nature of the investments offered by DBSI over their many years of operation.  Plaintiffs invested in only two of those offerings – 2008 Notes Corp. and LID.  The 2008 Notes Corp. and the LID offerings in which Plaintiffs invested were substantially different from other DBSI Notes offerings, and were tremendously different from the TIC investments in which a large percentage of the investors Plaintiffs seek to represent invested.

**A.**   **The Court Should Strike Plaintiffs' Class Action Allegations.**

Plaintiffs' proposed class fails, and the class allegations set forth in paragraphs 295-301 and the *ad damnum* portion of the Complaint should be dismissed because: (1) Plaintiffs lack standing to assert claims for investments in entities in which they did not invest, (2) the requirements of commonality and (3) typicality are defeated on the face of the Complaint.

1.      **Plaintiffs Lack Standing to Assert Claims Related to DBSI Companies In Which They Did Not Invest.**

As the Supreme Court has stated:

> That a suit may be a class action ... adds nothing to the question of standing, for even named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.

*Lewis v. Casey*, 518 U.S. 343, 357, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996).

"It is well-settled that a named plaintiff in a class action lawsuit is required to establish Article III standing." *In re Magnesium Oxide Antitrust Litig.*, Civ. No. 10–5943 (DRD), 2011 WL 5008090, at *7 (D.N.J. Oct. 20, 2011) (citing *Casey*, 518 U.S. at 357); *see also In Re Salomon Analyst Level 3 Litigation*, 350 F. Supp.2d 477, 496-497 (S.D.N.Y. 2004) ("the selection of lead plaintiffs does not remove the basic requirement that at least one named plaintiff must have standing to pursue each claim alleged"); *In re Global Crossing Securities Litigation*, 313 F.Supp.2d 189, 205 (S.D.N.Y. 2003) ("Lead Plaintiffs have a responsibility to identify and include named plaintiffs who have standing to represent the various potential subclasses of plaintiff who may be determined ... to have distinct interests or claims."); *In Re WorldCom, Inc. Securities Litigation*, 294 F.Supp.2d 392, 422 (S.D.N.Y. 2003); In *re IPO Securities Litigation*, 214 F.R.D. 117, 122–23 (S.D.N.Y.2002); *Griffin v. Dugger*, 823 F.2d 1476, 1483 (11th Cir. 1987) ("a claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to that claim."); *Fair Housing of the Dakotas, Inc. v. Goldmark Property Management, Inc.*, Civil No. 3:09–cv–58., 2011 WL 4381912, at *3 (D. N.D. Sept. 20. 2011).  The normal rule is that, "if a case has only one class representative and that party does not have standing, then the court lacks jurisdiction over the case and it must be dismissed." *Oetting v. Norton*, 795 F.3d 886, 892 (8th Cir. 2015).

In this action, Plaintiffs invested in two of the approximately 250 DBSI Companies in which purported class members invested. In cases involving multiples securities where the named plaintiff invests in one, but not all of the securities for which damages are sought, the Complaint must be dismissed as to those securities in which the named plaintiff did not invest, due to lack of standing. For example, in *In re Eaton Vance Securities Litigation*, 219 F.R.D. 38 (D. Mass. 2003), the plaintiffs sought to represent a class of investors in four mutual funds operated by the defendants, even though they had only invested in two of those funds. The court dismissed the plaintiffs' claims related to the two funds in which they had not invested on the grounds that the plaintiffs had not suffered an injury related to those funds sufficient to confer standing. 219 F.R.D. at 41. Similarly, in *In Re Salomon Analyst Level 3 Litigation*, 350 F. Supp.2d 477, 496-497 (S.D.N.Y. 2004), the court dismissed those counts of a securities fraud class action compliant which sought recovery for bondholders, where none of the named plaintiffs had purchased bonds, but were stockholders in the companies, for lack of standing to assert the claims. *Id.* at 496-497.

The same result should obtain here. Plaintiffs do not have standing to assert claims related to investments by purported class members in any DBSI Companies, other than the two in which they invested – 2008 Notes Corp. and LID. Plaintiffs' Complaint defines the proposed class as "All TIC Investors and all Holders of a Note Claim, Bond Claim, Preferred Unit, Sharing Unit, or Non-Preferred Unit" as defined in the DBSI Bankruptcy Plan. Compl. ¶ 295 [Dkt. 1]. Plaintiffs are not TIC Investors. Plaintiffs are holders of a Note Claim only for 2008 Notes Corp. The Complaint does not state how their investment in LID was classified in the Bankruptcy Plan. Plaintiffs cannot act as class representatives for any entities others than the two in which they invested. The class allegations of the Complaint that relate to any other DBSI

Companies, other than 2008 Notes Corp. and LID, should be stricken due to Plaintiffs lack of standing.

### 2. Common Questions of Fact and Law Do Not Predominate Over Individualized Concerns.

Rule 23(b)(3) provides that in order to certify a class action, the court needs to find "that the questions of law or fact common to class members *predominate* over any questions affecting only individual members." Fed R. Civ. P. 23(b)(3)(emphasis added). Plaintiffs contend that the commonality requirement is met because they have crafted a set of four questions that they claim raise common questions of law and fact. Compl. [Dkt. 1] ¶ 299. The four questions relate to: (a) Eide's alleged knowledge of the fraud of DBSI and the Insiders; (b) Eide's alleged substantial assistance of the fraud; (c) Eide's alleged agreement with DBSI/the Insiders to accomplish the fraud; and (d) whether and how the class members were damaged by the fraud. *Id*.

The Supreme Court has recently injected more rigor into the commonality inquiry, clarifying that it does not suffice for a plaintiff merely to raise common "questions," since "any competently crafted class complaint" will do so. *See Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-351, 131 S.Ct. 2541, 2551, 180 L.Ed.2d 374 (2011). "What matters to class certification ... is not the raising of common 'questions'—even in droves—but, rather the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." *Id*. (emphasis in original).

The superficial "commonality questions" crafted by Plaintiffs do not predominate over the serious questions that arise out of the separate underlying facts and different governing laws that will necessarily affect each individual class members' common law fraud claims in widely divergent ways. For example, significant factual questions arise out of the substantial

21

differences between the types of investment products that DBSI sold to investors. As the Complaint itself notes, those investment products included: (1) deeded TIC interests in a particular piece of real estate sold through traditional real estate brokers who worked with a DBSI entity named FOR 1031 LLC (later known as Spectrus Group LLC); (2) TIC interests sold as investment securities through securities brokers and a DBSI entity named DBSI Securities Corporation ("DBSI Securities"); and (3) investment notes offered through a series of DBSI entities, including 2005 Notes Corp., 2006 Notes Corp., and 2008 Notes Corp. Compl. [Dkt. 1] ¶¶ 51-89, 115-133. Because each different investment product had its own offering materials (referred to as PPMs, DDBs or Offering Circulars), which varied from product to product and over time, there are unique factual questions for each investor relating to (i) what fraudulent misrepresentations (if any) were directed to that investor, (ii) whether the misrepresentations were material to the investor's investment decision, (iii) whether the investor actually relied upon the misrepresentations; and (iv) whether and in what way the misrepresentations were the proximate cause of damage to the investor. Furthermore, Eide did not even audit all of the alleged class investment entities (or any of the Plaintiffs' investments).

Similarly, because investors from every one of the United States invested in DBSI's investment products, there may well be unique issues of law pertaining to each individual investor's legal rights that will further prevent Plaintiffs from satisfying the commonality requirement. *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1015 (7th Cir. 2002).

### a. Questions of individualized reliance predominate over any alleged common questions.

Allegations of fraud underlie the purported tort claims against Eide that Plaintiffs have denominated "Aiding and Abetting Fraud" and "Civil Conspiracy to Commit Fraud and/or Aid and Abet Fraud." Compl. [Dkt. 1] ¶¶ 154-177. To succeed under either theory, Plaintiffs

would necessarily have to prove the elements of a fraud claim with regard to each investor in the class that they seek to represent.   Under North Dakota law, detrimental reliance is a fundamental element of any common law fraud claim or any constructive fraud claim.  *Dahl v. Messmer*, 719 N.W.2d 341, 344 (N.D. 2006) (reliance is an essential element of any claim of fraud or deceit); *Fisher v. Cont'l Res., Inc.*, 49 F. Supp. 3d 637, 647 (D.N.D. 2014) (same).

Courts across the nation routinely hold that cases involving fraud and, in turn, issues of individual reliance, are unsuited for class certification. *See, e.g.*, *In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 618-19 (8th Cir. 2011) (citation omitted) ("'[I]n a typical common-law fraud case, a plaintiff must show that he or she received the defendant's alleged misrepresentation and relied on it.' Claims requiring individual proof of reliance are generally not amenable to class certification because common evidence could not 'suffice to make out a prima facie case for the class.'")); *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1253 (2nd Cir. 2002) ("[L]iability for fraudulent misrepresentations cannot be established simply by proof of a central, coordinated scheme. Rather to recover for a defendant's fraudulent conduct, even if that fraud is the result of a common course of conduct, each plaintiff must prove that he or she personally received a material misrepresentation, and that his or her reliance on this misrepresentation was the proximate cause of his or her loss"); *Malack v. BDO Seidman, LLP*, 617 F.3D 743, 756 (3rd Cir. 2010) (affirming denial of certification because individual issues of reliance predominated in a securities fraud class action where no presumption of reliance applied); *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 341-42 (4th Cir. 1998). ("[T]he reliance element of plaintiffs' fraud … [is] not readily susceptible to class-wide proof."); *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 745 (5th Cir. 1996) (noting that "a fraud class action cannot be certified when individual reliance will be an issue."); *Unger v. Amedisys, Inc.*, 401 F.3d 316, 321 (5th Cir. 2005) (in securities fraud case, court stated "[i]f the circumstances

23

surrounding each plaintiff's alleged reliance on fraudulent representations differ, then reliance is an issue that will have to be proven by each plaintiff, and the proposed class fails Rule 23(b)(3)'s predominance requirement"); *Clark v. Experian Info. Solutions, Inc.*, 256 Fed. App'x 818, 821 n.1 (7th Cir. 2007) (affirming denial of certification of class asserting consumer fraud claims under the ICFA and noting that "[e]ven if the court were to reach [plaintiff's negligent misrepresentation] claims, they would similarly fail because negligent misrepresentation requires a showing of reliance" which would in turn defeat predominance."); *Mazza v. Am. Honda Motor Co, Inc.*, 666 F.3d 581, 590 (9th Cir. 2012) ("[C]ommon issues of fact would not predominate in the class as currently defined because it almost certainly includes members who were not exposed to, and therefore could not have relied on, Honda's allegedly misleading advertising material."); *Chieftain Royalty Co. v. QEP Energy Co.*, 281 F.R.D 499, 504-05 (W.D. Okla. 2012) (finding that the reliance question in a fraud claim prevented the class from satisfying the commonality requirement of 23(a)(2)."); *see also* Fed. R. Civ. P. 23, Notes of Advisory Committee on Rules 1966 Amendment – (noting "a fraud case may be unsuited for treatment as a class action if there was material variation in the representation made or in the kinds or degrees of reliance by the persons to whom they were addressed") (citations omitted).

In the present case, there are far too many individualized factual inquiries and variances in what each potential class member relied upon in making their investment decisions to certify the proposed class. There is simply no way that each of the 6,000+ potential class members, who invested in over 250 different DBSI products, at different times over the course of more than ten years, could have relied to their detriment on the small set of financial statements audited by Eide during 2005-08. *See Ashcroft v. Iqbal*, 556 U.S. 662, 663-64 (2009) (noting that a reviewing court is to draw on its experience and common sense in reviewing a complaint for plausibility).

24

Here, the Complaint's reliance allegations are dubiously thin: "***At least some*** Investors received the financial statements of the Audited Entities that were audited … by Eide Bailly" and "***Investors relied*** on the Eide Bailly financial statements and audits in deciding whether to initiate or maintain their investments in the Audited Entities and/or investments guaranteed by an Audited Entity." Compl. [Dkt. 1] ¶ 168 (emphasis added).  Two glaring problems with these allegations jump off the page:

1.  Plaintiffs essentially admit that only *some* unidentified potential Class members received and/or relied on some unidentified financial statements of some unidentified DBSI entity that Eide allegedly audited (although Eide seriously doubts that any investors ever received copies any of its audit reports); and

2.  There are no allegations that Plaintiffs *themselves* are included in the unidentified group of "Investors" that allegedly received and/or relied on financial statements that were audited by Eide.[8]

Other reliance problems lurk just beneath the surface of the Complaint.  For starters, according to Exhibit E to the Complaint [Dkt. 1-5], the first audits that Eide conducted of the financial statements of any DBSI entity were for fiscal year 2004, which means that Eide's first audit reports would not have been issued until 2005.  In other words, the earliest that any DBSI investor could possibly have seen and relied upon an Eide audit report was in 2005.  Yet the proposed Class includes investors who invested in TICs, Bonds and Notes well before 2005.  At the other end of the spectrum, Plaintiffs only invested in 2008 Notes Corp. and LID.  2008 Notes Corp. was an investment entity whose notes were not offered to investors until February of 2008 and which Eide never audited.  Similarly, LID was an investment entity whose interests were offered to investors in 2007 and which was not audited by Eide.  It is impossible to fathom which Eide audit Plaintiffs could possibly have relied on when making their decision to invest in 2008 Notes Corp. or LID, since Eide audited neither.

---

[8] It is striking that Plaintiffs do not allege any personal reliance of any kind upon Eide's work.

To be clear, of the more than 250 DBSI entities that potential class members invested in, only a handful were ever audited by Eide.  Many investors invested with DBSI before Eide ever audited a single DBSI company, invested with DBSI before Eide audited the entity in which they invested, or (like the Plaintiffs) invested in entities that Eide never audited.

Moreover, *in addition* to allegedly relying on Eide audit reports, and in most cases, *instead* of relying on those reports, there is a plethora of other information and unique motivations that potential class members most likely relied upon in making their investment decisions, including, without limitation:

- The individualized and widely varying written sales materials (PPMs/DDBs) associated with each of the distinct, 250+ investment products for which Plaintiffs seek class treatment

- Unique conversations with different broker-dealers or investment advisors, potentially numbering into the hundreds or thousands

- Conversations with other investors, family, friends, colleagues

- Conversations with DBSI personnel/Insiders

- Investors' own due diligence investigation and analysis of DBSI and/or the specific investment product in question

- Advice from tax advisors

- The desire for the tax advantage of a deferral of capital gains tax by making a "like kind" property exchange under Section 1031 of the Internal Revenue Code via a TIC investment.[9]

- The unique features of each real estate parcel syndicated as a TIC (including "location, location, location," to cite the obvious)

---

[9] As Plaintiffs correctly explain in paragraphs 46-48 54 of the Complaint, Section 1031 (26 U.S.C. § 1031) allows an owner of real property to defer recognition of the otherwise taxable gain the owner may have upon selling the property if the owner uses the proceeds from the sale to purchase a similar or "like-kind" property within a certain time.  In 2002, the I.R.S. ruled that a TIC interest in real property may qualify as "like-kind" property for purposes of Section 1031 under certain circumstances.  Rev. Proc. 2002-22 (I.R.S. 2002).

- In the case of Notes investors, a need for investment diversity or the lack of suitable alternative investments

Each individual member of the proposed class may or may not have relied on any number of the above items, or others, in making their investment decisions. What is certain is that *each* investor will have to be called upon to recite their own unique stories under oath, during discovery and at any resulting trial, *before* a determination of fraud can be made as to *his or her unique* investment decision. And as one court has noted, merely because a plaintiff claims not to have relied on factors extrinsic to an alleged misrepresentation does not mean that the defendant will acquiesce in that characterization. *In re St. Jude Med., Inc.*, 522 F.3d 836, 840 (8th Cir. 2008). It simply is not the case that a generalized allegation that (only) "at least some" of the investors relied on unidentified Eide audits performed for unidentified DBSI entities will suffice to meet the stringent requirements of Rule 23.

## B. Plaintiffs Cannot Meet the Typicality Requirement.

The third requirement of Rule 23(a)(3) is that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a). "Commonality" and "typicality" are separate but related requirements of class certification. *DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1174–75 (8th Cir. 1995). In *DeBoer*, the Eighth Circuit Court of Appeals explained:

> [c]ommonality is not required on every question raised in a class action. Rather, Rule 23 is satisfied when the legal question "'linking the class members is substantially related to the resolution of the litigation.'" ... The burden of demonstrating typicality is fairly easily met so long as other class members have claims similar to the named plaintiff.

*Id.* at 1174-1175 (citations omitted).

27

This Court, in *Fair Housing of the Dakotas, Inc. v. Goldmark Property Management, Inc.*, Civil No. 3:09-cv-58, 2011 WL 4381912 (Sept. 20, 2011, D.N.D.), denied class certification on, *inter alia*, typicality grounds, stating:

> "The presence of a common legal theory does not establish typicality when proof of a violation requires individualized inquiry." *Elizabeth M. v. Montenez*, 458 F.3d 779, 787 (8th Cir.2006). This is true even where injunctive relief is sought. *Parke v. First Reliance Standard Life Ins. Co.,* 368 F.3d 999, 1004–05 (8th Cir.2004). Here, given the broad class of putative class members-all current tenants since September 2, 2008, who have an assistance animal in a Goldmark-managed property-the fact-finder will have to make a case-by-case determination as to whether the Fair Housing Act was violated as to each member and whether he or she is entitled to any relief. The putative class members do not necessarily share the same injury and do not find themselves in the same legal position, as some have claims in which the Court has found implicate the Fair Housing Act and some have claims that the Court has made no such determination. Plaintiffs have failed to establish the typicality requirement. There are simply too many individual issues to satisfy the typicality requirement. (Emphasis added).

*Id.* at *5 (emphasis added).

In *In re Eaton Vance Corp Securities Litigation*, 219 F.R.D. 38 (D. Mass. 2003), the Court held that purported class representatives in a securities fraud action, who did not purchase shares of each of the defendant companies, did not meet the typicality requirement of Rule 23(a), stating:

> There is, however, a question on the element of typicality. The named plaintiffs' claims are typical of the class when their injuries "arise from the same events, practice or course of conduct of the defendants as do the injuries which form the basis of the class claims." *Adair v. Sorenson*, 134 F.R.D. 13, 17 (D.Mass. 1991). The named plaintiffs in this case argue that their claims are typical of the class because the defendants made identical false and misleading statements throughout the entire proposed class period. At oral argument, the defendants disputed this fact. As part of their motion for class certification, the named plaintiffs did not supply this Court with detailed documentation regarding the various registration statements that are at issue. Therefore, this Court cannot determine whether the statements made by the defendants in the registration statements were uniform across the entire proposed class period. It is ultimately the named plaintiffs who bear the burden of establishing that class certification is appropriate. *See Markarian v. Conn. Mut. Life Ins. Co.*, 202 F.R.D. 60, 63 (D.Mass. 2001). As far as the proposed class period is concerned, the named plaintiffs have failed to meet their burden. Accordingly, this Court rules that the named plaintiffs can only

represent a class of investors who purchased Classic shares pursuant to the same prospectuses as the named plaintiffs, namely, the Classic prospectus dated April 1, 1998, the Classic prospectus dated November 2, 1998, and the Classic prospectus dated March 15, 2000.

*Id.* at 43.

Here, Plaintiffs falsely assert that "Plaintiffs and other members of the Class must prove the same facts in order to establish the same claims … which apply to all Class members." Compl. [Dkt. 1] ¶ 298. As discussed below, the purported class members are not alike in what they must prove, or in the type and nature of their investments to meet the typicality requirement of Rule 23(a)(3).

### 1.    All Investors Are Not Alike.

The class definition proffered by Plaintiffs includes any investor, in the history of time, who was ever an investor in a DBSI TIC, or the holder of a Note or Bond Claim or a Preferred, Sharing or Non-Preferred Unit who did not assign their causes of action to the PAT. Compl. [Dkt. 1] ¶ 295. The definition itself denotes the significant difference in interests possessed by each member of the class. Most fundamentally, however, the categories of different investors in DBSI products (TICs, Notes, Funds, Bonds, etc.) cannot be collapsed into one general category, because each set of investors is materially different from the rest.

### a.    *TIC Investors*.

TIC investors, unlike any other members of the proposed class, received ownership interests in tangible real estate, in exchange for their investments, as well as regular returns on their investments in the form of rent payments. *See* Compl. [Dkt. 1] ¶¶ 50, 55-63, 73-81. Plaintiffs estimate that there were approximately 150 TICs sold as securities to approximately 10,000 investors and another approximately 148 TICs sold via real estate deeds to an undisclosed number of investors. *Id*. ¶¶ 54, 89. Because the TIC real estate investors were so different from

29

all of the other financial investors, it makes sense that the Complaint contains a separate section with sixty-nine different paragraphs devoted only to TICs. *Id*. ¶¶ 45-113. The entirety of these sixty-nine paragraphs simply do not apply to the named Plaintiffs, who only invested in 2008 Notes Corp. and LID neither of which is a TIC, and to the other investors in the proposed class that invested in something other than a TIC.

Some TIC investors, unlike the other investors in the proffered class, purchased their interest in the investment properties subject to the "master lease" structure. *Id*. ¶ 55, 80. The Complaint devotes at least forty-five paragraphs to allegations relating only to the master lease structure (*Id*. ¶¶ 55-100), a concept that is wholly inapplicable to other class members, including many TIC owners and the named Plaintiffs. Moreover, because Master LeaseCo was only formed in 2005, *Id.* ¶ 82, TIC interests sold before that time had nothing to do with Master LeaseCo.

The Complaint also contains a separate section of allegations devoted entirely to "accountable reserves." Compl. [Dkt. 1] ¶¶ 101-113. Accountable reserves, and thus, all of the allegations in this particular section of the Complaint, relate only to those TIC investors who invested in TIC properties for which DBSI collected such reserves, and do not relate in any way to the named Plaintiffs or other non-TIC investors in the putative class. *See Id*. ¶ 104 ("*After August 15, 2005*, Accountable Reserves were collected in connection with *almost every* Investment Property in which DBSI sold investments." (emphasis added)).

There are also significant differences between the TIC investors themselves, including, but not limited to:

- Investors who purchased deeded TIC interests versus investors who purchased TIC interests as securities. Compl. [Dkt. 1] ¶ 51.

30

- Deeded TIC interests were marketed and sold with Due Diligence Binders ("DDBs"); TIC interests sold as securities were marketed and sold with Private Placement Memoranda ("PPMs"). *Id*. ¶¶ 72, 78.

- Each set of offering materials (whether a PPM or a DDB) contained its own separate set of individualized representations.

- Deeded TICs interests were sold through FOR 1031; TIC interests sold as securities were sold through DBSI Securities. *Id*. ¶¶ 52, 75.

- Some TICs had accountable reserves, some did not. *Id*. at ¶ 103 (the concept of accountable reserves did not apply to pre-August 2005 TICs).

- Even for those TICs that had accountable reserves, the representations made in the PPMs and DDBs about such reserves differ. *See* Compl. Ex. C [Dkt. 1-3].

- Out of the nearly 300 TICs, Eide only ever audited 32.  Compl. Ex. E [Dkt. 1-5].

- By Plaintiffs' own admission, some TICs were profitable, capable of producing reliable revenue, and were financially secure, while others allegedly were not. *See* Compl. [Dkt. 1] ¶ 95.

- The type of investment property varied from TIC to TIC: some were multifamily units, some were office buildings, some were retail shopping centers, and one was even a Federal Courthouse.  *Id*. ¶ 50.

Simply put, the potential claims of TIC investors differ from substantially from one investor to another, and are nothing like the claims that the Plaintiffs allegedly possess as 2008 Notes Corp. or LID investors.

### b.    *Bond and Fund Investors*.

The class definition includes, pursuant to the definitions set forth in the Bankruptcy Plan, holders of bonds issued by DBSI 2001A Funding Corporation, DBSI 2001B Funding Corporation, DBSI 2001C Funding Corporation, DBSI Guaranteed Capital Corporation ("GCC") and DBSI Real Estate Funding Corporation.  *See* DBSI Bankr. Case, Second Am. Joint Chapter 11 Plan [Dkt. 5699] at §§ 1.18, 1.42, 1.43, 1.44, 1.66 and 1.93.  However, the only mention of any "bond" in the Complaint is in a section where "Bond Corps." are grouped together with Notes Corps. and Development Funds under the heading "The Funding Entities," all of which

Plaintiffs allege were offered "as early as 2004." Compl. [Dkt. 1] ¶¶ 114-116. In fact, investments in all of the above-described entities were offered before 2004, meaning the offerings pre-dated all of Eide's audit work for any DBSI entities. *Compare* Compl. Ex. E [Dkt. 1-5] (listing years for which Eide audited various DBSI entities), *with* DBSI Bankr. Case, Plan Disclosure Statement, [Dkt. 5700] at 76-77 (stating initial bond offering dates).[10] Moreover, other than Real Estate Funding Corp., Eide never audited any of these companies. *See* Compl. Ex. E [Dkt. 1-5].

Including the investors in these entities as members of the putative class makes no sense because there is no way that any such investors could have relied on anything Eide did in making their investments. The investors' relationships with DBSI predated Eide's. As such, the named Plaintiffs' claims are not typical of the holders of bond claims.

<em>c.      The Notes Corps.</em>

There are also significant differences between Plaintiffs' claims relating to their investment in 2008 Notes Corp. and the other Notes Corps. Most significantly, Eide never issued an audit for 2008 Notes Corp., whereas it did for 2005 and 2006 Notes Corps. (albeit not until after the putative class members made their investments in these entities). Compl. Ex. E [Dkt. 1-5]. The PPMs for the 2005 and 2006 Notes Corps. and the 2008 Notes Corp. offerings also varied significantly with respect to the disclosures regarding how the proceeds of the Notes could be spent. *Compare* Smith Decl. Ex. 3 (2006 Notes Corp. PPM) *with* Smith Decl. Ex. 5 (2008 Notes Corp. PPM). Unlike the PPM for 2006 Notes Corp., the 2008 Notes Corp. PPM

---

[10] According to the above-cited Plan Disclosure Statement, bonds issued by 2001A, 2001B, and 2001C Funding Corps. were offered pursuant to offering statements called "Offering Circulars" dated in 2001; bonds issued by GCC were offered pursuant to a "Confidential Offering Circular" dated January 15, 2002; and bonds issued by Real Estate Funding Corporation were offered pursuant to a "Confidential Offering Circular" dated February 10, 2003.

32

does not represent that the funds raised in that offering "will be used only to acquire, develop and finance real estate properties prior to their sale." Smith Decl. Ex. 5. Rather, the 2008 Notes Corp. PPM expressly states that the funds raised will also be used "to finance or refinance non-real estate Entities." *Id*., at 1, 6, 10, 12, 16, 20 and 24. The 2008 Notes Corp. PPM further explains that the "non-real estate Entities" being financed through the offering are a specific group of technology companies. *Id*. at 24-26.

### *d.      Holders of Preferred, Sharing or Non-Preferred Units.*

Pursuant to the definitions set forth in the Bankruptcy Plan, proffered class members include investors in DBSI 2006 Land Opportunity Fund LLC, DBSI Short-Term Development Fund LLC, DBSI 2008 Development Opportunity Fund LLC and DBSI 2007 Land Improvement & Development Fund LLC, all of which have different preference rights according to the offering documents and Bankruptcy Plan. *See* DBSI Bankr. Case, [Dkt. 5699] at §§ 1.46, 1.48, 1.69 and 1.94. These Funds differed from the other investment products that the proposed class members invested in, because the money invested in these Funds was to be used to acquire and develop, either directly or indirectly, undeveloped or raw land. DBSI Bankr. Case, [Dkt. 5700] at 77-80. Eide never audited any of these Funds. Compl. Ex. E [Dkt. 1-5]. These Funds were not subject to the "master lease" structure, and were not associated with any accountable reserves. As such, the voluminous allegations in the Complaint relating to those issues are irrelevant to this group of investors. Likewise, this group of investors has little in common with Notes investors.

Ultimately, the differences between the Plaintiffs and all the other potential groups of diverse investors encompassed by the putative class definition are so great that they render Plaintiffs improper class representatives and require that the Class Allegations be stricken from the Complaint.

## CONCLUSION

Eide respectfully requests that the Court dismiss the Complaint pursuant to Rule 12(b)(6), with prejudice, because the Complaint itself establishes that Plaintiffs' claims are time barred.  In addition, Eide requests that the Court dismiss the Complaint, with prejudice, on the further grounds that Plaintiffs have failed to allege any of their fraud-based claims with the particularity required by Rule 9(b).  Finally, if the Court does not dismiss the Complaint under either of these grounds, the Class allegations of the Complaint should be dismissed and stricken to the extent they relate to or include any investments other than 2008 Notes Corp. or LID.

MOSS & BARNETT
A Professional Association


Dated: September 27, 2016              By     /s/ Curtis D. Smith
                                            Curtis D. Smith
                                            Thomas J. Shroyer (admitted *Pro Hac Vice*)
                                        150 South Fifth Street, Suite 1200
                                        Minneapolis, MN 55402
                                        Telephone: (612) 877-5000
                                        Facsimile: (612) 877-5999
                                        Email:  Curt.Smith@lawmoss.com
                                                Tom.Shroyer@lawmoss.com

                                        ATTORNEYS FOR EIDE BAILLY LLP


3358107v1

34